USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9 | 28 | 10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PATRICK E. PETERS, SR.,                                  :
                                                         :
                                    Plaintiff,           :
                                                         :          **OPINION AND ORDER**
                        - against -                      :
                                                         :          **07 Civ. 1435 (RLE)**
METRO-NORTH COMMUTER RAILROAD                            :
COMPANY,                                                 :
                                                         :
                                    Defendant.           :

**RONALD L. ELLIS, United States Magistrate Judge:**

## I. INTRODUCTION

On February 28, 2007, Patrick E. Peters, Sr., brought an action under the Federal

Employers Liability Act ("FELA") against Metro-North Commuter Railroad Company ("Metro-

North") for cumulative trauma injuries, allegedly caused by unsafe and inadequate working

conditions over a period of twenty-one years of employment. (Compl. ¶¶ 8, 9.) Peters submitted

a report by Mark A. Heidebrecht, an expert in the field of ergonomics, in support of his claim.

(Notice of Mot. to Preclude Plaintiff's Proposed Expert and for Summ. J., ("Mot. to Preclude")

Ex. E ("Heidebrecht Report"), Nov. 30, 2009.) Metro-North seeks to preclude Heidebrecht's

report, and moves for summary judgment on the grounds that Peters's claims are time-barred and

that he has failed to show that Metro-North was negligent and caused his injuries. (Mot. to

Preclude at 1-2.) For the reasons which follow, Metro-North's Motion to Preclude Heidebrecht's

Report is **GRANTED, in part, and DENIED, in part,** and Metro-North's Motion for Summary

Judgment is **DENIED**.

## II. BACKGROUND

Peters was employed by Metro-North from August 1983 until July 2, 2004. (Mot. to Preclude, Ex. C ("Peters Dep.") at 6: 8-19.) During that period, he worked as a machinist in various capacities, including on a heavy repair gang, as a technician, and as an inspector. (*Id.* at 13:2-7, 19:18-25, 20:2-15.) As a machinist, his responsibilities included engine work, drop table work, and air brake work. (*Id.* at 13:2-7) Among other things, Peters's tasks involved manually manipulating and lifting heavy valves and blocking, tearing down and repairing engines, and pulling apart power assemblies. (*Id.* at 68:12-23, 72:11-25, 79:2-9.) He testified that he repeatedly complained to Metro-North, as early as 2000, that automatic tools were available for several of the above tasks, which he alleges caused his injury. (*Id.* at 87:1-25, 88:1-15, 91:4-18, 72:11-25, 78:3-11, 86:13-22.) For approximately the final year of his employment with Metro-North, Peters left the heavy repair gangs and became a "60 day line inspector," (*Id.* at 23:17-23) where he was responsible for testing, troubleshooting and changing air brake equipment. (*Id.* at 24:5-13.)

Peters first experienced lower back pain in 2003, while he was working as an inspector. (*Id.* at 39:1-12.) He went to a hospital to have X-rays, and was told that his back was injured and that he should see a doctor for treatment. (*Id.* at 31: 5-18, 33:19-25.) Later in 2003, Peters started having trouble walking and began experiencing severe pain in his legs. (*Id.* at 35: 9-25, 36:1-5.) In early 2004, he started seeing Dr. Peretz, who referred him to see Dr. Avitzur, a neurologist, and to a hospital to get a myelogram. (Mem. of Law in Opp'n to Def.'s Mot. to Preclude and for Summ. J. ("Opp'n Mem.") at 7, Jan. 11, 2010; Peters Dep. at 34:7-17.) After the myelogram, Dr. Peretz informed Peters that his back problem was severe but advised against surgery, telling Peters that surgery would likely exacerbate his injury. (Peters Dep. at 41:10-17.) In July 2004,

Peters entered disability retirement for back pains. (*Id.* at 47:5-13.) In 2005, Peters collapsed in

his bedroom, was unable to get up, and was taken to a hospital. (*Id.* at 43:22-25, 45:3-11.) He

was diagnosed with severe spinal stenosis, for which he had surgery on April 20, 2005. (*Id.* at

45:11-25, 46:5-19.) Peters claims that conditions in the repair shop precipitated his surgery to

have three vertebrae fused, his spine drilled out, and the nerve damage he suffered because of

that surgery. (*Id.* at 29:14-25.) The parties agree that "there was no single traumatic event" that

caused the injuries that led to Peters's surgery (Opp'n Mem. at 7), but they dispute (1) when

Peters came to believe that his pain was caused by his job at Metro-North, and (2) whether his

work was actually the source of his injuries. Peters argues that "the only way" he could have

become aware of the cause of his injuries was through "professional advice." (*Id.*) He testified

that none of the doctors he visited about his back problems in 2003 and 2004 mentioned that the

conditions he suffered were caused by anything work-related. (*Id.* at 106:14-21.) Thus, Peters

maintains that "[r]ight up through his surgery in April 2005, [he] was still unaware of the

underlying cause of his back injury." (Opp'n Mem. at 7.) In contrast, Metro-North argues that

Peters knew or should have known whether his injuries were work-related as early as 2003, when

they first manifested. (Reply Aff. in Supp. of Mot. to Preclude and for Summ. J. ("Def.'s Reply

Aff.") ¶6.)

Ronald D. Schiable, an expert for Metro-North, prepared a report on December 3, 2008,

investigating the ergonomic hazards in Metro-North's workplace as well as the claims by Peters

that his workplace was not reasonably safe. (Mot. to Preclude, Ex. D ("Schiable Report").)

Schiable found that Peters claims were "unsubstantiated and without technical merit," in large

part because Peters had not documented information relating to various stressors that could cause

injury and because Peters had not considered "nonwork-related factors" when claiming that his

injury was due exclusively to workplace risk factors. (*Id*. at 4.) Heidebrecht, an expert for Peters, submitted a report claiming that causal links existed between the injuries suffered by Peters and the ergonomic hazards of the workplace. (Heidebrecht Report at 30.) Metro-North does not dispute Heidebrecht's qualifications as an expert in the field of ergonomics; instead, they dispute whether or not the conclusions drawn are properly within his area of expertise and whether or not his methodology in this case was proper. (Mem. of Law in Support of Mot. to Preclude Plaintiff's Proposed Expert and for Summ. J. ("Metro-North Mem.") at 8, November 30, 2009.)

### III. DISCUSSION

#### A. Dr. Heidebrecht's Report is Admissible, in Part, and Precluded, in Part

There is no dispute that Peters has satisfied his burden of showing that Heidebrecht is an expert in his field of specialized knowledge, ergonomics. Heidebrecht's qualifications include his Board Certification in Ergonomist/Human Factors, and his seventeen years of experience working and teaching in the fields of biomechanics, physiology, and ergonomics. (Opp'n Mem., Aff. at 1.) He has written a number of peer-reviewed articles on the subject of repetitive work tasks and their relation to permanent injury. (*Id*.) Accordingly, Heidebrecht's report appropriately discusses the history of ergonomic risk factors and musculoskeletal disorders, and the particular work-related tasks that generally contain risk factors. (Heidebrecht Report at 3-6.)

Metro-North argues, however, that the three opinions Heidebrecht offers in his report should be precluded. First, it argues that his opinion regarding what Metro-North knew or should have known is not a matter of expert or scientific analysis that is reducible to a reasonable degree of scientific certainty. (Metro-North Mem. at 7.) Second, it argues that Heidebrecht's opinion regarding the existence of ergonomic risk factors in the locomotive shop should be precluded because it is not based on any objectively measured evidence. (*Id*. at 8). Finally, Metro-North

4

argues that his opinion regarding the cause of Peters's injury should be precluded because it is a medical opinion outside of Heidebrecht's expertise. (*Id.*) For the reasons which follow, Heidebrecht's opinions regarding the existence of ergonomic risk factors and how those risk factors contributed to Peters's injuries are admissible, but his opinion regarding what Metro-North should have known is precluded.

### 1. The *Daubert* Standard for Admissibility of Expert Testimony

Expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the case." Fed. R. Evid. 702. To determine admissibility, the court must decide if the proffered testimony is relevant and reliable. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597(1993). In assessing reliability, the court must determine whether the testimony (1) relates to "scientific knowledge" and (2) will "assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. To determine if scientific knowledge will assist the trier of fact, a court must assess an expert's methodology to determine if it is scientifically valid and can properly be applied to the facts in issue. *Id.* at 592-93. In determining reliability, factors to be considered include whether a theory or technique can be and has been tested; if it has been subject to peer review and publication; the known or potential rate of error; and whether the theory or technique has been generally accepted. *Id.* at 593-94. Ultimately, the court's inquiry is a flexible one and its overarching subject is the scientific validity and evidentiary relevance and reliability of the principles that underlie a proposed

submission. *Id.* at 594-95. The focus is solely on the principles and methodology, not on the conclusions they generate. *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence." *Id.* at *596.*

### 2. Heidebrecht's opinion regarding what Metro-North knew or should have known is precluded

In his report, Heidebrecht opines "to a reasonable degree of scientific certainty" that Metro-North "knew or should have known of the ergonomic risk factors at the Croton-Harmon locomotive shop and the development of musculoskeletal disorders during Mr. Peters' employment and prior to his injuries." (Heidebrecht Report at 30.) This opinion is based upon Heidebrecht's knowledge of a number of publications and trainings about work-related cumulative trauma disorders that have been available to the American Association of Railroads ("AAR"), an organization of which Metro-North is a member. (*Id.* at 5-6). According to Heidebrecht, these documents show that the AAR and Metro-North had knowledge of, or should have had knowledge of, the development and prevention of cumulative trauma disorders in the workplace. (*Id.* at 5.) Metro-North argues this opinion is not a matter of expert or scientific analysis that is reducible to a reasonable degree of scientific certainty. (Metro-North Mem. at 7.) The availability of information to Metro-North about ergonomic risk factors in the workplace is relevant evidence for a jury to consider when evaluating whether Metro-North knew about the risks associated with the tasks Peters performed. However, the connection between the availability of information and Metro-North's awareness of that information is not an opinion based upon specialized knowledge and is not reducible to a reasonable degree of scientific certainty. It is a conclusion that a jury may draw on its own, without the need of expert

6

assistance. Thus, Heidebrecht's ultimate opinion regarding what Metro-North knew or should have known is **PRECLUDED**.

### 3. Heidebrecht's opinion regarding the ergonomic risk factors Peters was exposed to while working at Metro-North is admissible

Heidebrecht's second opinion is that the job tasks performed by Peters at Metro-North contained "ergonomic risk factors which were known, prior to and during [his] employment, to contribute to the development of musculoskeletal disorders." (Heidebrecht Report at 32.) Metro-North argues that this opinion should be precluded because it is not based on any objectively measured evidence. (Metro-North Mem. at 8). According to Metro-North, Heidebrecht "chose only to rely on impressions and extrapolations derived from his brief and casual visual inspection," and his opinion suffers from "imprecise methodology and inadequate investigation." (*Id.*) After reviewing the scientific basis and methodology for Heidebrecht's opinion, this Court finds that his opinion regarding Peters's exposure to ergonomic risk factors at work is admissible.

Heidebrecht's opinion about the existence of ergonomic risk factors is within his expertise in the field of ergonomics, and it helps a trier of fact understand the evidence and determine a material fact in issue between the parties. Furthermore, his opinion was not, as Metro-North contends, based solely on brief and casual visual inspections; rather, his conclusion was informed by his discussions with Peters, a tour of the facility where Peters worked, literature in the field, and computer modeling of the tasks Peters performed. (Opp'n Mem., Aff. at 1-4.) Specifically, Heidebrecht reviewed with Peters "the postures he used, the weights he lifted, the duration of his work, the repetition of his work and the equipment involved." (*Id.* at 2.) He then spent time touring Peters's workplace, studying the tasks Peters had to perform. (*Id.*) He then used "The University of Michigan #D Static Strength Prediction Program, Version 6.0.2, to

7

perform the biomechanical analysis and quantify ergonomic risks" associated with Peters's job at Metro-North. (*Id.*) Accordingly, Heidebrecht's opinion is not only within the scope of his expertise and relevant, but the methodology he relies upon in reaching his conclusion is reliable and rooted in scientific knowledge. As a result, Heidebrecht's opinion regarding the existence of ergonomic risk factors is **ADMISSIBLE**.

### 4. Heidebrecht's opinion that the ergonomic risk factors Peters was exposed to caused to Peters's injury is admissible

Heidebrecht also offers the opinion that Peters's injuries "were caused, in whole or in part, by his exposure to ergonomic risk factors" while working for Metro-North. (Heidebrecht Rep. at 30.) Metro-North argues that this opinion should be precluded because it is outside of Peters's expertise and based on unreliable scientific methods. (Metro-North Mem. at 7.) According to Metro-North, Heidebrecht's opinion on causation "is a medical opinion which does not contain a differential diagnosis" and does not "take into consideration non-occupational risk factors." (*Id.*) Furthermore, Metro-North argues that his methodology lacks scientific or technical reliability because, among other things, it "provides no basis for determining that his hypothesis can be tested." (*Id.*) Ultimately, Metro-North's notion of what expertise and evidence must be relied upon for an expert to offer an opinion on causation is too narrow. A medical doctor is not the only expert qualified to offer such an opinion. Heidebrecht has shown, through scientifically reliable epidemiological evidence, that the ergonomic risk factors he identified are a likely contributing cause to the injuries Peters suffered.

Heidebrecht's report appropriately relies upon epidemiological evidence to show that the risk factors he identified contributed to the injuries Peters suffered. There is extensive literature within the field of ergonomics that establish a strong causal connection between exposure to certain ergonomic risk factors and the development of low back disorders. (Opp'n Mem, Aff. at

4.) As discussed previously, Heidebrecht's report identified a number of ergonomic risk factors

that Peters was exposed to at work. These risk factors included "(1) heavy physical work, (2)

lifting and forceful movements, (3) bending and twisting (awkward postures), (4) whole-body

vibration, and (5) static work postures." (Heidebrecht Report at 28.) Heidebrecht also identified

over forty articles that provided evidence between the relationship between those risk factors and

low back disorders. (*Id.*) It is not beyond Heidebrecht's expertise to rely upon epidemiological

evidence showing the link between those risk factors and lower back injuries to conclude that

Peters's specific injuries were likely work-related. This is the type of opinion that Heidebrecht is

qualified to give as an expert in the field of ergonomics, and is based on scientifically reliable

epidemiological evidence. Therefore, Heidebrecht's opinion on causation is **ADMISSIBLE.**

## B.  Summary Judgment

Metro-North moves for summary judgment on two grounds. First, it argues that Peters's

FELA claim is time-barred as a matter of law. Second, it argues that Peters has failed to

introduce sufficient evidence to prove negligence or causation. This Court has determined that

there is a genuine issue of material fact as to both issues.

### 1.  Standard of Review for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a

motion for summary judgment if it determines that "there is no genuine issue of material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under

this standard, summary judgment is proper if "viewing the record in the light most favorable to

the nonmoving party, the evidence offered demonstrates that there is no genuine issue of fact and

that the moving party is entitled to judgment as a matter of law." *Pension Benefit Guar. Corp. v.*

*LTV Corp.*, 875 F.2d 1008, 1015 (2d Cir. 1989) (internal quotations omitted), *rev'd on other*

*grounds*, 496 U.S. 633 (1990). In making this determination, the court does not resolve disputed factual issues, but reaches a conclusion as to whether there exists "a genuine and material issue for trial." *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1175 (2d Cir. 1993). An issue of fact is "genuine" if it provides a basis for "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate where no reasonable trier of fact could find in favor of the nonmoving party, *H. L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989), thereby "dispos[ing] of meritless claims before becoming entrenched in a frivolous and costly trial." *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987).

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568 (2d Cir. 1993) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). This burden may be met by demonstrating that there is a lack of evidence to support the nonmoving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party satisfies this initial burden, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[T]he mere existence of factual issues – where those issues are not material to the claims before the court – will not suffice to defeat a Motion for Summary Judgment." *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985); *see also Anderson*, 477 U.S. at 247-48.

## 2. The Timeliness of the FELA Claim

FELA's three-year limitations period begins to run "when the plaintiff in the exercise of reasonable diligence knows both the existence and the cause of his injuries." *Mix v. Delaware & Hudson Ry. Co.,* 345 F.3d 82, 86 (2d Cir. 2003). "[U]nder this 'discovery rule,' the plaintiff is considered to be on notice when he 'knows or should know that his injury is merely work-related,' regardless of whether he knows the specific cause of the injury." *Maloney v. CSX Transp., Inc.,* 2010 WL 681332, at *4 (N.D.N.Y 2010) (*quoting Bruno v. Metro. Transp. Auth.,* 544 F.Supp.2d 393, 397 (S.D.N.Y. 2008)). Peters brought this action on February 28, 2007. To prevail, Metro-North must show that there is no genuine issue of material fact as to whether Peters knew of his injuries and knew, or should have known, that they were work-related before February 28, 2004.

### a. Peters knew of his injuries more than three years before commencing this action

In 2003, Peters was experiencing pain in his lower back and legs and underwent X-rays of his back, after which he was informed that he had a back injury for which he should consult a doctor. (Peters Dep. at 33:19-25.) Although the "continuing violation" doctrine does not apply to FELA claims, "a plaintiff can recover for injuries that are 'sufficiently distinct from those previously suffered,' or for 'aggravation to existing injuries . . . caused by a distinct act of negligence whose existence and relationship to the injury was unknown prior to the three-year period preceding the suit." *Maloney,* 2010 WL 681332, at *4 (*quoting Mix,* 345 F.3d at 90). Additionally, "a plaintiff may maintain a claim for 'accumulation' if he can demonstrate that his initial symptoms were temporary and only became permanent upon their accumulation during the three-year period." *Id.* (*citing Mix,* 345 F.3d at 88-91).

In this case, the parties agree that "there was no single traumatic event" that caused Peters's injuries (Opp'n Mem. at 7), and there is no evidence of a distinct act of negligence that came to light after February 28, 2004. Peters has produced no evidence suggesting that the symptoms of back and leg pain that he began experiencing in 2003 were initially temporary and became permanent only through the accumulation of trauma experienced after February 28, 2004. Nor does he suggest that his initial lower back problem, which he began experiencing in 2003, is distinct from the "cumulative trauma" upon which his claim is predicated. (*Id.*) Thus, Peters knew of the injuries to his lower back and legs prior to February 28, 2004, more than three years before he commenced this action.

> **b.  There is a genuine issue of material fact as to whether Peters knew or should have known his injuries were work-related outside the limitations period**

Metro-North argues that regardless of whether Peters actually knew his injuries were work-related, a reasonable person should have known whether his back pain was work-related shortly after he started experiencing pain in 2003. (Mot. to Preclude, at 2.) In response, Peters argues that he diligently sought medical assistance to understand the cause of his injuries, and that he did not actually know that his injuries were work-related until after his surgery in 2005. (Opp'n Mem., at 7.) Viewing the facts in the light most favorable to Peters, there is a genuine dispute about when he should have known that his injuries were related to his job with Metro-North.

After he began experiencing back pain in 2003, Peters had a responsibility to investigate whether his injuries were work-related. At that point in time, Peters was aware that the tasks he performed at work were strenuous. This is evidenced by his periodic complaints to Metro-North about having to complete heavy jobs manually instead of with more appropriate automatic tools.

(Peters Dep. at 87:17-22, 91:4-8.) However, there is a genuine issue of material fact regarding whether the causal connection between his work and his injuries was so obvious that a reasonable person should have known immediately that his injuries were work-related.

Peters took a number of steps to ascertain the nature and cause of his pain shortly after he began experiencing it. He initially went to a hospital for X-Rays and was told to consult with a doctor. (*Id.* at 33:8-25.) He was later evaluated by Dr. Peretz, who did not tell Peters that his injury was caused by work-related activities. (*Id.* at 106:14-21.) Following this consultation, Peters got a myelogram and was evaluated by Dr. Avitzur, a neurologist. (*Id.* at 34:12-25, 35:1-5.) Dr. Avitzur also did not tell Peters that his injury was caused by work-related activities. (*Id.* at 106:14-21.) Metro-North presents no evidence that either of these health care providers were unaware of Peters's work. Yet, neither made the connection between the work and the injury. There is no evidence that a reasonable lay person would independently draw such a conclusion. While there is evidence that Peters's work involved some physical stress, a rational trier of fact could conclude that it was reasonable that Peters did not know that his injuries were work-related prior to February 28, 2004. Because there is a genuine issue of material fact, Metro North's Motion to Dismiss Peters's Complaint as time-barred is **DENIED**.

### 3. There is a genuine issue of material fact regarding Metro-North's negligence and whether Metro-North's negligence caused Peters's injuries

FELA provides that a railroad is "liable in damages to any person suffering injury while he is employed by [the railroad] . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . ." 45 U.S.C. § 51. The Supreme Court has construed this statute liberally to promote the remedial goal of allowing for recovery for injuries and deaths of railroad workers in recognition of the physical dangers of such work. *See Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994). For

13

the purposes of FELA, negligence is a federal question, governed by the statutory provisions and federal common law. *Morant v. Long Island Railroad*, 66 F.3d 518, 522 (2d Cir. 1995). A plaintiff in a FELA case is required to prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation. *Sinclair v. Long Island Railroad*, 985 F.2d 74, 77 (2d Cir. 1993). However, "[i]t is well established that the role of the jury is significantly greater in Jones Act and FELA cases than in common law negligence actions. The right of the jury to pass upon the question of fault and causation must be most liberally viewed." *Johannessen v. Gulf Trading & Transp. Co.*, 633 F.2d 653, 656 (2d Cir. 1980).

Heidebrecht's report is more than sufficient to create a genuine issue of material fact with regard to Metro-North's negligence and whether that negligence ultimately caused Peters's injuries. As discussed previously, Heidebrecht's report provides evidence that the tasks performed by Peters contained ergonomic risks, and that those risks contributed to Peters's back injury. Furthermore, although Heidebrecht's opinion regarding whether Metro-North should have known about those risks has been precluded, there is still sufficient evidence of the information available to Metro-North, in the form of reports and trainings about those risks, for a jury to conclude that Metro-North had constructive notice of the problem and that Peters's injury was foreseeable. Therefore, Peters has produced evidence in admissible form to create a genuine issue of material fact concerning Metro-North's alleged negligence and the relationship of the negligence to Peters's injury. Metro-North's Motion for Summary Judgment is **DENIED.**

## IV. CONCLUSION

Heidebrecht's report offers opinions on matters within his expertise as an ergonomic's expert, and Metro-North's Motion to Preclude Heidebrecht's report is **GRANTED, in part, and DENIED, in part.**

There is a genuine issue of material fact as to whether Peters should have known the cause of his injuries more than three years before commencing this action and as to whether Metro-North was negligent and caused Peters's injuries. As a result, Metro-North's Motion for Summary Judgment is **DENIED**.

SO ORDERED this 28th day of September 2010
New York, New York

The Honorable Ronald L. Ellis
United States Magistrate Judge

15